STATE EX REL. HAY, RELATOR, *v.* ALDERSON, SECRETARY OF
STATE, RESPONDENT.

(No.  3,517.)

(Submitted July 9, 1914.    Decided July 16, 1914.)

[142 Pac. 210.]

*Initiative and Referendum—Constitutional Law—Amendments*
*Plurality of Subjects — Publication — Sunday — Mandatory*
*Provisions—Construction.*

Constitution—Amendments—Validity—Rule of Construction.
1.  The rule that a statute will not be declared unconstitutional
unless its nullity is placed beyond reasonable doubt is especially
applicable in the case of an amendment to the Constitution which
has been decisively adopted and the invalidity of which is charged
to the manner of its submission.

[As to the caution courts observe in respect of declaring statutes
void, see note in 48 Am. Dec. 269.   As to power of courts to determine
validity of action by legislature proposing constitutional amendment,
see note in Ann. Cas. 1914B, 925.]

Same—Unity of Subject—How Determined.
2.  That an amendment to the state Constitution may be separated
into two or more propositions is not alone decisive of its uncon-
stitutionality under the clause requiring unity of subject in the
submission of an amendment (Art. XIX, sec. 9); the rule being that
if, in the light of common sense, the propositions have to do with
different subjects so essentially unrelated that their association is
artificial, they are not one, but if they may be logically viewed as parts
or aspects of a single plan, the constitutional requirement above is
met in their submission as one amendment.

Same—Initiative and Referendum—Validity of Amendment.
3.  *Held,* under the rule above, that the amendment to section 1,
Article V of the state Constitution, providing for direct legislation
and reference of laws, is not invalid as violative of the provision of
section 9, Article XIX, providing that should more than one amend-
ment be submitted at the same election, it shall be done in such a
manner that each can be voted upon separately.

Same—Publication—When Sufficient.
4.  *Held,* that the provision of section 9, Article XIX, requiring
publication of a proposed constitutional amendment in full in at
least one newspaper in each county for three months previous to the
next general election, was satisfied by publication in a weekly, or
once a week in a daily or semi-weekly paper, in the absence of a
provision indicating the number of issues in which the proposed
amendment must appear, or designating the character of the paper
as monthly, weekly or daily.

Same—Publication on Sunday.
5.  In the absence of a prohibitory statute, any ministerial act, such
as the publication of an amendment to the state Constitution, may
be done on Sunday as efficaciously as if done on any other day.

Same—Rule of Construction.
>   6. In the construction of a constitutional provision, any rule which either offends against every dictate of common sense or defeats the very object of the provision to which it is applied, ought not to be adopted.

Same—Amendments—Publication—Substantial Compliance Sufficient.
>   7. *Held* that the provision of section 9, Article XIX of the Constitution, respecting publication of a proposed amendment thereto, has to do with one of the features of the amending process which is referable to the rule of substantial, rather than literal, compliance, even though under section 29, Article III,. the provisions of that instrument are declared to be mandatory and prohibitory,—especially in the absence of any intimation that injury resulted from a failure to comply literally with the requirement.

Same—Initiative and Referendum—Publication—Sufficiency.
>   8. Under the rule that every reasonable intendment will be indulged in favor of the validity of a constitutional amendment after its ratification by the people at the polls, the Initiative and Referendum amendment to section 1, Article V, of the Constitution, adopted by a vote of 5.5 to 1 about eight years before its validity was questioned on the ground, *inter alia,* that the secretary of state had failed to literally comply with the constitutional requirement touching publication thereof, *held* properly submitted.

Original application by the state, on relation of G. R. Hay, for an injunction restraining A. M. Alderson, as secretary of state, from proceeding to refer a certain law to the people for adoption or rejection. Order to show cause discharged, and proceeding dismissed.

### STATEMENT OF THE CASE.

The thirteenth legislative assembly enacted a measure known as House Bill No. 154, under the title: "An Act establishing a state athletic commission and regulating boxing and sparring in the state of Montana." (Laws 1913, p. 429.) By approval of the Governor it became a law on March 14, 1913. Within six months after the adjournment of the legislature a referendum petition was filed with the secretary of state, signed by the requisite number of electors, designated as "Referendum Measure No. 6," ordering that the Act be referred to the electors of the state for their approval or disapproval at the election to be held on November 3, 1914, under the provisions of section 1 of Article V of the Constitution. In pursuance of the statute enacted to effectuate this provision, and within the time prescribed (Rev. Codes, sec. 110; Laws 1913, Chap. 66, sec. 1), the

secretary of state was proceeding to furnish the clerks of the several counties of the state with copies of the referendum measure, with the title thereto, for distribution among the electors therein, when the relator, a qualified elector and resident taxpayer of Lewis and Clark county, applied to this court for an injunction to restrain the respondent, as such officer, from proceeding further in the premises. In making the application, the relator proceeded upon the assumption that the secretary of state, in having the copies printed and furnished to the clerks at the expense of the state, was acting without authority of law, in that the amendment to section 1 of Article V of the Constitution, *supra,* providing for direct legislation and reference of laws, was never legally submitted to, and ratified by, the electors of the state and is therefore invalid, and that the legislation enacted to effectuate it is also invalid. Upon the filing of the petition an order to show cause was issued. The respondent appeared by general demurrer. This having been overruled *pro forma,* he filed an answer. Though the answer contains formal denials of some of the allegations of the petition, it presents no material issue of fact. Therefore the questions for decision arise upon the facts as alleged in the petition, which may be briefly stated as follows:

The ninth legislative assembly passed an Act requiring the submission of the amendment in question to the electors of the state. The Act set out in full the section as it would read as amended. It provided the form of the ballot to be used, directing that there should be printed thereon the following: "For the Amendment to the Constitution Providing for Direct Legislation and Reference of Laws," and "Against the Amendment to the Constitution Providing for Direct Legislation and Reference of Laws."

When the Constitution was adopted, the section read as follows: "The legislative power shall be vested in a Senate and House of Representatives, which shall be designated 'The Legislative Assembly of the State of Montana.'" (Article V, sec. 1.)

The amended section is the following: "The legislative authority of the state shall be vested in a legislative assembly, consist-

ing of a Senate and House of Representatives; but the people reserve to themselves power to propose laws, and to enact or reject the same at the polls except as to laws relating to appropriations of money, and except as to laws for the submission of constitutional amendments, and except as to local or special laws, as enumerated in Article V, section 26, of this Constitution, independent of the legislative assembly; and also reserve power at their own option to approve or reject at the polls, any Act of the legislative assembly, except as to laws necessary for the immediate preservation of the public peace, health or safety, and except as to laws relating to appropriations of money, and except as to laws for the submission of constitutional amendments, and except as to local or special laws, as enumerated in Article V, section 26, of this Constitution. The first power reserved by the people is the initiative, and eight per cent of the legal voters of the state shall be required to propose any measure by petition; provided, that two-fifths of the whole number of the counties of the state must each furnish as signers of said petition eight per cent of the legal voters in such county, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the secretary of state, not less than four months before the election at which they are to be voted upon.

"The second power is the referendum, and it may be ordered either by petition signed by five per cent of the legal voters of the state; provided, that two-fifths of the whole number of the counties of the state must each furnish as signers of said petition five per cent of the legal voters in such county, or, by the legislative assembly as other bills are enacted.

"Referendum petitions shall be filed with the secretary of state, not later than six months after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. The veto power of the Governor shall not extend to measures referred to the people by the legislative assembly or by initiative referendum petitions.

"All elections on measures referred to the people of the state shall be had at the biennial regular general election, except when

the legislative assembly, by a majority vote, shall order a special election.   Any measure referred to the people shall still be in full force and effect unless such petition be signed by fifteen per cent of the legal voters of a majority of the whole number of the counties of the state, in which case the law shall be inoperative until such time as it shall be passed upon at an election, and the result has been determined and declared as provided by law. The whole number of votes cast for Governor at the regular election last preceding the filing of any petition for the initiative or referendum shall be the basis on which the number of legal petitions and orders for the initiative and for the referendum shall be filed with the secretary of state; and in submitting the same to the people, he, and all other officers, shall be guided by the general laws and the Act submitting this amendment, until legislation shall be especially provided therefor.   The enacting clause of every law originated by the initiative shall be as follows: 'Be it enacted by the people of Montana.'   This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure.''

At the election held on November 6, 1906, the amendment was ratified by the following vote: For the amendment, 36,374; against the amendment, 6,616—the affirmative and negative vote cast in the several counties being approximately in the same ratio.   On December 6, 1906, by proclamation the Governor declared the amendment to be in force.   Prior to the election, publication was directed by the secretary of state to be made in newspapers in the several counties to meet the requirement of section 9, Article XIX, of the Constitution.   In most of the counties publication covered the full period of three months immediately prior to the day of the election.   In about one-third of the entire number publication was made for thirteen consecutive weeks only from and after July 27, 1906, the earliest date of any publication, thus leaving ten days or more—in one instance twenty-three—to intervene between the date of the last publication and the day of election.   In three counties publication was made in one issue each week in a daily paper.   In one

instance publication was made in the Sunday·issue only of a daily paper, except that during the last week before the election publication was made daily. In another publication was made only in the alternate issues of a semi-weekly paper.

*Mr. Odell W. McConnell,* for Relator, submitted a brief, and, jointly with *Mr. Henry C. Smith,* of Counsel, argued the cause orally.

This court has specifically held that the provisions of Article XIX, section 9, of the state Constitution, relative to amendments to the Constitution, are mandatory, and a noncompliance with the requirements of this section renders the adoption of a proposed amendment nugatory. (*State* v. *Tooker,* 15 Mont. 8, 25 L. R. A. 560, 37 Pac. 840; *Durfee* v. *Harper,* 22 Mont. 354, 56 Pac. 582.)

More than one amendment to Article V of the Constitution was submitted without so preparing and distinguishing the same by numbers or otherwise that each could be voted upon separately. Article XIX above expressly provides that if more than one amendment is submitted at the same election they shall be so prepared and distinguished by numbers or otherwise that each can be voted upon separately. This provision of the Constitution is mandatory. An examination of section 1 of Article V of the Constitution, as amended, discloses that two separate and distinct powers are reserved by the people. The amendment voted upon and passed in 1906 labels them ''The first Power'' and ''The Second Power.'' The first power is called the ''initiative'' and the second power is called the ''referendum.'' The plan of putting in force the initiative is different from the plan to make the referendum effective. A different number of votes is required to order the initiative (eight per cent) than that to order the referendum (five per cent). One is the distinct power of enacting or making laws; the other is a different power, being that of vetoing laws. The initiative is legislative in character. The referendum power is executive in character, being a veto power the same as the Governor exercises. The initiative performs a positive function, while the ref-

erendum accomplishes a negative function. One is the antithesis of the other. One originates and starts something; the other kills and stops. One power is not dependent upon the other. One power may be invoked, the other not. Each power is complete within itself. The referendum amendment might have been passed and no mention at all made of the initiative, and *vice versa*. The referendum is of ancient origin. It made its appearance in Switzerland in 1831 under the name of "Veto." The initiative is a more recent measure. Treatises on the initiative and referendum consider the two measures as separate and distinct subjects. Oberhaltzer on the Referendum, Initiative and Recall in America devotes 300 pages in his work to the Referendum, before taking up or discussing the Initiative as a separate and distinct policy. Phelps on Initiative and Referendum considers them as two independent powers. The ballot for the amendment requires the voter to vote for "Direct Legislation and Reference of Laws." He cannot vote for "Direct Legislation" and against "Reference of Laws," nor can he vote for "Reference of Laws" and against "Direct Legislation." He must vote for both or against both. He cannot segregate nor vote for one without voting for the other. The form of ballot denied him the right to vote for one and against the other.

The true test as to whether "Direct Legislation" and "Reference of Laws" constitute one amendment or two amendments may be determined by inquiring as to whether one of them could be adopted without the other, or whether one of them could be adopted without being controlled, modified or qualified by the other. (See *McBee* v. *Brady*, 15 Idaho, 761, 100 Pac. 97; *State ex rel. McClurg* v. *Powell*, 77 Miss. 543, 48 L. R. A. 652, 27 South. 927.) The case of *State* v. *Timme*, 54 Wis. 318, 11 N. W. 785, holds: "In order to constitute more than one amendment, the propositions submitted must relate to more than one subject and have at least two distinct and separate purposes, not dependent upon or connected with each other."

It matters not that the amendments in this case were addressed to section 1 of Article V. This does not make it one amendment, as was held in the *McBee-Brady Case, supra.* (See, also, *Lobaugh* v. *Cook,* 127 Iowa, 181, 102 N. W. 1121.; *Lozier* v. *Alexander Drug Co.,* 23 Okl. 1, 99 Pac. 808; *Armstrong* v. *Berkey,* 23 Okl. 176, 99 Pac. 921.)

The application of the above test conclusively shows that two amendments were proposed as one amendment without being so prepared, numbered or designated that they could be voted upon separately, in direct violation and derogation of the mandatory provision of the Constitution requiring them so to be.

Were the amendments published in at least one newspaper in each county of the state for three months previous to the election? An attempt was made to publish notice of the proposed amendments in each county of the state, and contracts were sent to some paper in each county, but instead of the contract specifying, in the language of the Constitution, that. the publication should be made "for three months" in each and every issue of the paper so contracted with, the contract required the publication to be made once a week only, and for thirteen weeks. The provision of Article XIX, section 9 of the Constitution, which requires the amendments to be published for three months previous to the election, is mandatory. It was so expressly held by this court in the case of *State ex rel. Woods* v. *Tooker,* 15 Mont. 8, 25 L. R. A. 560, 37 Pac. 840. Three months means a period of ninety days, and when the Constitution said the publication must be made "for three months," it meant three full months or ninety days,—not six days short, not one day short, but all of ninety days. The word "month" means a calendar month of thirty days, and three months mean ninety days. (Rev. Codes, sec. 16; *Sprague* v. *Norway,* 31 Cal. 173; *Savings & Loan Soc.* v. *Thompson,* 32 Cal. 347; *Guaranty Trust etc. Co.* v. *Greene Cove Springs etc. R. Co.,* 139 U. S. 137, 35 L. Ed. 116, 11 Sup. Ct. Rep. 512.) Where the requirement was that the publication shall be "for four weeks," the court held that this requires twenty-eight days' publication. So

where the Constitution requires the publication to be "for three months," this requires ninety days' publication. (*Young* v. *Downey*, 150 Mo. 317, 51 S. W. 751; see, also, *State* v. *Tucker*, 32 Mo. App. 620, 630; *Loughridge* v. *City of Huntington*, 56 Ind. 253, 260; *Maxwell* v. *Burns* (Tenn. Ch.), 59 S. W. 1067; *Lawson* v. *Gibson*, 18 Neb. 137, 24 N. W. 447; *Whitaker* v. *Beach*, 12 Kan. 492; *Hellman* v. *Merz*, 112 Cal. 661, 44 Pac. 1079; 12 Ency. of Pl. & Pr. 35.) The language of the Constitution is "for three months." The preposition "for" is the equivalent of the word "during." (*Lawson* v. *Gibson*, 18 Neb. 137, 24 N. W. 447; *Whitaker* v. *Beach*, 12 Kan. 492.)

There is a distinction between those cases where the publication was to be "for" a definite space of time and those cases which require a "weekly" publication for a certain number of weeks. The first requires a publication "for," "throughout" or "during the continuance of" six weeks, and nothing short of publication for forty-two days will satisfy this Act. The other requires at least six publications, and that one of them shall be in each of the six weeks between the first publication and the day of sale. (*Finlayson* v. *Peterson*, 5 N. D. 587, 57 Am. St. Rep. 584, 33 L. R. A. 532, 67 N. W. 953; 13 Ency. of Law, 738; *Leavitt* v. *Bell*, 55 Neb. 57, 75 N. W. 524; *Early* v. *Doe*, 57 U. S. (16 How.) 610, 14 L. Ed. 1079; *Bacon* v. *Kennedy*, 56 Mich. 329, 22 N. W. 824; *Muncey* v. *Joest*, 74 Ind. 409; *Wilson* v. *Northwestern Mut. Life Ins. Co.*, 65 Fed. 38, 12 C. C. A. 505; *Harmon* v. *Whittemore*, 7 Ohio Dec. 92; *Mitchell* v. *Woodson*, 37 Miss. 567; *Dever* v. *Cornwell*, 10 N. D. 123, 86 N. W. 227.)

Publication was not made in every issue of the paper; in daily papers it was made weekly, and in semi-weekly papers it was made in every other issue of the paper only. There were no daily publications of notice of the proposed amendments in any papers. In no paper in the state were they published oftener than once a week. When the publication was made in a daily paper it should have been continued in each and every issue of that paper, and likewise in a semi-weekly paper, publication

should have been made in each and every issue thereof. (*Union Pacific Ry. Co.* v. *Montgomery,* 49 Neb. 429, 68 N. W. 619; *Hull* v. *Chicago B. etc. R. Co.,* 21 Neb. 371, 32 N. W. 162; *Whitaker* v. *Beach,* 12 Kan. 492; *McCurdy* v. *Baker,* 11 Kan. 111.)

Periods of from eleven to twenty-four days intervened between the date of the last publication and the date of election. The Constitution says the publication must be made "for three months previous to the next general election," which means for three months next preceding the election. There should be no interval of time between the date of the last publication and the day of election when there were publications of the paper issued. Publication should have been made in each and every issue of the paper up to the 6th day of November, 1906. The last issue of the paper preceding November 6 should have contained the notice of the proposed amendments. (*Hartley* v. *Croze,* 38 Minn. 325, 37 N. W. 449; *Hellman* v. *Merz,* 112 Cal. 661, 44 Pac. 1079.)

The publication was not made for three months next to and immediately preceding the election. The supreme court of this state, in the case of *Dowty* v. *Pittwood,* 23 Mont. 113, 57 Pac. 727, held that the words, "for at least one year preceding such election," means one year next preceding the election. (See, also, *Russell* v. *Croy,* 164 Mo. 69, 63 S. W. 849.)

The publication of notice of these constitutional amendments was a legal notice required by the express mandate of the Constitution. The publication of it on Sunday and in a Sunday newspaper is illegal, void and amounts to no publication at all. In this state it has been expressly held that the service of a summons on Sunday is void. (*Hauswirth* v. *Sullivan,* 6 Mont. 203, 9 Pac. 798.) It has likewise been held in different jurisdictions that the publication of a legal notice on Sunday is void. (*Ormsby* v. *City of Louisville,* 79 Ky. 197; *Scammon* v. *City of Chicago,* 40 Ill. 146.) The publication of notice of a sheriff's sale in a Sunday newspaper is void. (*Shaw* v. *Williams,* 87 Ind. 158, 44 Am. Rep. 756.) A sale of property for taxes, if made upon a notice published only in a Sunday newspaper, is void, and the rule is too well settled to be now opened

to controversy. (*Schwed* v. *Hartwitz*, 23 Colo. 187, 58 Am. St. Rep. 221, 47 Pac. 295.) Service of notices and affidavits on Sunday is irregular and void. (*Field* v. *Park*, 20 Johns. (N. Y.) 140.) "The weight of authority supports the proposition that the publication, in whole or in part, of a summons or other legal notice, in a newspaper published on Sunday, is void." (37 Cyc. 587; *McChesney* v. *People*, 145 Ill. 614, 34 N. E. 431.)

The secretary of state required the publication to be made once a week only for thirteen weeks, when the Constitution required the publication to be made for three months previous to the election. There should have been a publication of fourteen weeks. (*Savings & Loan Soc.* v. *Thompson*, 32 Cal. 347, 351.) Publication ended on the date of the last insertion of the notice in the paper. (*Calvert* v. *Calvert*, 15 Colo. 390, 24 Pac. 1043; *Banta* v. *Wood*, 32 Iowa, 469; *Foster* v. *Vehmeyer*, 133 Cal. 459, 65 Pac. 974; *Savings & Loan Soc.* v. *Thompson*, 32 Cal. 347, 351.) When the last publication was made in the paper, that was the end of the publication of the notice. It did not continue on for another week; so that when the publication was made commencing on July 27 and ending on October 19, the period from July 27 to October 19 was the period of publication, and none other.

A noncompliance with the provision that the proposed amendments to the Constitution should be published for three months renders the amendment invalid. (*State ex rel. Galusha* v. *Davis*, 20 Nev. 220, 19 Pac. 894.) The action of the secretary of state in changing the wording of the Constitution and making the publication only once a week for thirteen weeks instead of for three months could not be justified on the ground that it was the previous custom of that office so to do. (*Maxwell* v. *Burns* (Tenn. Ch.), 59 S. W. 1067.)

*Mr. D. M. Kelly*, Attorney General, for Respondent, and *Messrs. Walsh, Nolan & Scallon* filed a brief; *Mr. C. B. Nolan* argued the cause orally.

Before referring to the cases which discuss the proposition as to whether the subject matter of the initiative and referen-

dum should be submitted in two separate amendments, we might advert to the fact that, so far as we are advised, in the different states where this form of legislation is authorized through constitutional amendment, it has been submitted to the people as if it were a single proposition and has not been submitted as two separate amendments; and, so far as we are advised, up to this time, no objection has been raised that this subject should have been submitted as two separate and distinct propositions.

We do not believe that as to the objection made in this respect there is any merit. The purpose of the amendment was to provide for direct participation by the people in framing legislation. The simple fact that one provision authorizes the initiation of legislation by the people and the other provides for the repeal of legislation does not make the proceedings so foreign to each other as to call for their submission by separate amendments. The subject matter has to do with participation in legislation by the people. Indeed, without a referendum at all, the purpose which it seeks to accomplish could be effected through the initiative. It provides, however, for a speedy method of disposing of obnoxious legislation. The same purpose could be accomplished through the initiative by the enactment of legislation at variance with the legislation intended to be repealed. It cannot be said, then, that the two propositions are so foreign to each other that the provision of the Constitution referred to should require their submission as separate and distinct propositions. (See *Hammond* v. *Clark,* 136 Ga. 313, 38 L. R. A. (n. s.) 77, 71 S. E. 479; *State* v. *Timme,* 54 Wis. 318, 11 N. W. 785; *State* v. *Herried,* 10 S. D. 109, 72 N. W. 93; *Gabbert* v. *Chicago etc. Ry. Co.,* 171 Mo. 84, 70 S. W. 891; *Lobaugh* v *Cook,* 127 Iowa, 181, 102 N. W. 1121; *People* v. *Prevost* (Colo.), 134 Pac. 129; *People* v *Sours,* 31 Colo 369, 102 Am. St. Rep. 34, 74 Pac. 167; *Bethea* v. *Town of Dillon,* 91 S. C. 413, 74 S. E. 983; *Bott* v. *Wurts,* 63 N. J. L. 289, 45 L. R. A. 251, 43 Atl. 744, 881.) This court, in the case of *State* v. *McKinney,* 29 Mont. 375, 1 Ann. Cas. 579, 74 Pac. 1095, discussing the requirement of the Constitution as to what should appear in the title of a

bill, said: ''The title is generally sufficient if the body of the Act treats only, directly or indirectly, of the subjects mentioned in the title and of other subjects germane thereto, or of matters in furtherance of or necessary to accomplish the general objects of the bill, as mentioned in the title.'' And so, we say, in this instance, the initiative and referendum amendment referred to had to do with the subject of legislation directly by the people. The matter of repeal is not so distinct from the matter of the enactment of a law that the two propositions should be separately submitted. It must be borne in mind that the scheme contemplated by the amendment in question was intended to repose in the people the authority to frame legislation, and the exercise of this authority efficiently would, of necessity, contemplate the repeal of laws, which, in the judgment of the people, should not be continued in force.

We respectfully submit that this attack upon the amendment on the ground under consideration is without merit, and the authorities to which reference is made by petitioner have very little persuasive effect when we consider the facts to which the decisions in question relate.

The constitutional requirement as to publication requires the secretary of state to cause the amendments to be published in full in at least one newspaper in each county, if any there be, for three months previous to the next general election for members to the legislative assembly. It will be noticed that the provision in question does not require that in the case of daily papers the publication shall appear in each issue; nor does it require that in the case of semi-weekly papers the publication shall appear in each issue published. It will be noted, likewise, that the secretary of state is not required to publish the notices up to the day of election. The only requirement is that he shall cause the amendments to be published in full in at least one newspaper in each county, if such there be, for three months previous to the next general election. With the Constitution indefinite in the matter of publication in the particulars referred

to, the secretary of state expressly required that the publication should be a weekly publication.

This brings us to the consideration in the first place, as to whether or not the publication should appear in the papers up to the time of election, assuming that the publications were made for three months preceding the election, as the provision of the Constitution expressly requires. In the case of *Bethea* v. *Town of Dillon, supra,* the Code of South Carolina provided that twenty days prior to a special election, the books of registration should be opened for registration of the names of the qualified electors, and should remain open for ten days. The books were opened twenty-five days before the election and were kept open for ten days, and it was contended that the bonds could not be legally issued because the election was illegal. It was held that "the slight variance in this case cannot be held to have vitiated the election," since "it does not appear that any qualified elector failed to obtain a registration certificate and the consequent right to vote on account of the variance of the time fixed by the statute. It follows that the irregularity complained of did not affect the result and was therefore immaterial." This proposition is very exhaustively discussed in the case of *Commonwealth ex rel. Attorney General* v. *Griest,* 196 Pa. 396, 50 L. R. A. 568, 46 Atl. 505, where it was held that the provision as to the time of publication was directory merely. (See, also, *State ex rel. Torreyson* v. *Grey,* 21 Nev. 378, 19 L. R. A. 134, 32 Pac. 190; *Hoboken* v. *Gear,* 27 N. J. L. 265; *Russell* v. *Croy,* 164 Mo. 69, 63 S. W. 849.) A clear distinction exists between a case where action is taken before an election is held and where action is taken after the people have declared their purpose at the polls. (*Potter* v. *Furnish,* 46 Mont. 391, 128 Pac. 542; *Reid* v. *Lincoln County,* 46 Mont. 31, 125 Pac. 429.)

It is insisted, however, that in the case of the publication in the "Anaconda Standard," the same appearing in the Sunday issue, such publication was a nullity. This contention is without merit. It is true that in the case of *Hauswirth* v. *Sullivan,* 6 Mont. 203, 9 Pac. 798, it was held by this court that a summons

served on Sunday was a nullity.   The doctrine of that case was
overruled in the well-considered case of *Burke* v. *Interstate etc.
Assn.,* 25 Mont. 315, 327, 87 Am. St. Rep. 416, 64 Pac. 879.
Surely, a notice such as we are considering calls for no stricter
rules than does a summons, and, under the doctrine of the
*Burke Case, supra,* a summons published on Sunday would not
be a nullity.   (See *Heisen* v. *Smith,* 138 Cal. 216, 94 Am. St.
Rep. 39, 71 Pac. 181; likewise *Havens* v. *Stiles,* 8 Idaho, 250, 101
Am. St. Rep. 195, 1 Ann. Cas. 277, 56 L. R. A. 736, 67 Pac. 919.)
Filing of complaint on Sunday and the issuance of summons on
that day.   (*Nixon* v. *City of Burlington,* 141 Iowa, 316, 18 Ann.
Cas. 1037, 115 N. W. 239.)   The spreading of a judgment on the
records on Sunday is a ministerial act and good.   (*Puckett* v.
*Guenther,* 142 Iowa, 35, 134 Am. St. Rep. 402, 120 N. W. 123.)

Even though the publication is defective in some of the coun-
ties referred to, the defect is so slight as to scarcely merit con-
sideration.   As we have already stated, the Constitution re-
quired the publication to be made in one newspaper at least in
each county for three months previous to the next general elec-
tion.   The publication has been made for three months, as we
have already shown.   Assuming, for the sake of the argument,
that in one or two of the counties, computing the time on a calen-
dar month basis, there was a shortage of one or two days, would
such a defect invalidate an amendment to the Constitution over-
whelmingly adopted?   Whatever might be said about such a de-
fect before the election was held, after the people have spoken
and spoken so decisively, we insist that public policy would
demand that the amendment should stand.   The supreme court
of Arizona, in the case of *Allen* v. *State,* 14 Ariz. 458, 44 L. R. A.
(n. s.) 468, 130 Pac. 1114, favors the principle here advocated.

We insist that an inconsequential departure from the express
requirement of the Constitution should be treated as of no effect.
In the matter of the publication called for, we insist that a sub-
stantial compliance with the requirements of the Constitution
suffices, and that the publication in this case in the different
counties to which reference is made is substantially in accord

with what the Constitution demands.     (See *Nesbit* v. *People,* 19
Colo. 441, 36 Pac. 221; *Prohibitory Amendment Cases,* 24 Kan.
700; *Saunders* v. *Board of Liquidation,* 110 La. 313, 34 South.
457; *State* v. *Herried,* 10 S. D. 109, 72 N. W. 93; *State* v. *Secretary of State,* 43 La. Ann. 590, 9 South. 776; *Worman* v. *Hagan,*
78 Md. 152, 21 L. R. A. 716, 27 Atl. 616; *Taylor* v. *Commonwealth,* 101 Va. 829, 44 S. E. 754; *People* v. *Sours,* 31 Colo. 369,
102 Am. St. Rep. 34, 74 Pac. 167.)

In support of the proposition that it is not necessary that a
publication should be made daily or in every issue of a paper,
where such publication is not positively required by Constitution
or statute, we refer to the following cases: *Sherwood* v. *Wallin,*
154 Cal. 735, 99 Pac. 191; *Chapman* v. *Zoberlein,* 152 Cal. 216,
92 Pac. 188; *People* v. *Reclamation Dist. No. 136,* 121 Cal. 522,
50 Pac. 1068, 53 Pac. 1085; *Wood* v. *Knapp,* 100 N. Y. 109, 2
N. E. 632; *Bowen* v. *Argall,* 24 Wend. (N. Y.) 496; *Brewer* v.
*City of Springfield,* 97 Mass. 152; *Dayton* v. *Mintzer,* 22 Minn.
393; *In re Harris,* 14 R. I. 637; see, also, *Wilson* v. *Bradley,* 105
Ky. 52, 20 Ky. Law Rep. 1118, 48 S. W. 166, 1088; *Southworth*
v. *City of Glasgow,* 232 Mo. 108, Ann. Cas. 1912B, 1267, 132
S. W. 1168.     The New York cases above cited, also, support the
proposition that a weekly publication counts for six days following the day of publication.

*Mr. E. K. Cheadle* and *Mr. Wellington D. Rankin,* for Respondent, each submitted a brief and argued the cause orally.

*Mr. Jos. M. Dixon* and *Mr. Alexander Mackel,* of Counsel.

## Opinion: PER CURIAM.

1. The relator's first contention is that the amendment in question is invalid, because not submitted in conformity with the
provision of section 9, Article XIX of the Constitution, as follows: "Should more amendments than one be submitted at the
same election, they shall be so prepared and distinguished by
numbers or otherwise that each can be voted upon separately."

From the language of the amendment itself, from the nature of the functions involved, and from historical considerations, it is possible to view the initiative and the referendum as separable propositions and thus to construct an argument of such plausibility as to completely justify the reference of the question to this court, in order that doubt upon the subject should be set at rest.    To briefly illustrate: It is suggested by the relator that the amendment itself distinguishes the initiative from the referendum, specifically characterizes them as "the first power" and "the second power," respectively, and prescribes different conditions upon which they may be invoked; that, as submitted, the elector was obliged to accept or reject both, although one of them—the initiative—is wholly legislative in character, and commends itself to minds who might oppose the referendum as calculated to disturb rights vested under enactments of the legislature, while the referendum is a veto, pertains to the executive power, and commends itself to many who might view the initiative as wholly vicious because dispensing with the kind of deliberation supposed to give to enactments of the legislature their principal title to respect; and, finally, that the initiative is neither contemporaneous in origin nor coextensive in use with the referendum; hence their independence of each other is historically established.    Suggestive as all this is, it fails to require that the amendment be annulled, for reasons which we proceed to state.

In the case of statutes passed by the legislative assembly and assailed as unconstitutional the question is not whether it is possible to condemn, but whether it is possible to uphold; and we [1]    stand committed to the rule that a statute will not be declared unconstitutional unless its nullity is placed, in our judgment, beyond reasonable doubt.    (*State* v. *Camp Sing,* 18 Mont. 128, 137, 56 Am. St. Rep. 551, 32 L. R. A. 635, 44 Pac. 516.) The application of this rule is especially commended in the case of an amendment to the Constitution solemnly and decisively adopted, the invalidity of which is charged to the method of its submission and made dependent upon a possible theory of its

nature. (*State* v. *Herried*, 10 S. D. 109, 72 N. W. 93; *Koehler*
v. *Hill*, 60 Iowa, 543, 14 N. W. 738.) "Constitutions," says
Judge Story, "are not designed for metaphysical or logical
subtleties, for niceties of expression, for critical propriety, for
elaborate shades of meaning, or for the exercise of philosophical
acuteness or judicial research. They are instruments of a prac-
tical nature, founded on the common business of human life,
adapted to common wants, designed for common use, and fitted
for common understandings. The people make them, the people
adopt them, the people must be supposed to read them with the
help of common sense, and cannot be presumed to admit in them
any recondite meaning or any extraordinary gloss." This lan-
[2] guage applies with equal force to amendments, and the fact
that an amendment can be separated into two or more proposi-
tions concerning the value of which diversity of opinion may exist
is not alone decisive. If, in the light of common sense, the prop-
ositions have to do with different subjects, if they are so essen-
tially unrelated that their association is artificial, they are not
one; but if they may be logically viewed as parts or aspects of a
single plan, then the constitutional requirement is met in their
submission as one amendment. This was the clear intimation of
this court in *State ex rel. Teague* v. *Board of Commissioners*, 34
Mont. 426, 87 Pac. 450, and finds expression in the following
authorities from other jurisdictions: *State* v. *Timme*, 54 Wis. 318,
11 N. W. 785; *State* v. *Herried, supra; Gabbert* v. *Chicago, R. I.
& P. Ry. Co.*, 171 Mo. 84, 70 S. W. 891; *Lobaugh* v. *Cook*, 127
Iowa, 181, 102 N. W. 1121; *People* v. *Prevost* (Colo.), 134 Pac.
129; *People* v. *Sours*, 31 Colo. 369, 102 Am. St. Rep. 34, 74 Pac.
167; *Hammond* v. *Clark*, 136 Ga. 313, 38 L. R. A. (n. s.) 77, 71
S. E. 479; *State* v. *Mason*, 43 La. Ann. 590, 9 South. 776. The
unity of subject implicitly required by the provision in question
does not essentially differ from the unity of subject required by
section 23, Article V, of the Constitution, concerning Acts of the
legislative assembly: "No bill, except general appropriation bills,
and bills for the codification and general revision of the laws
shall be passed containing more than one subject which shall be

clearly expressed in its title.'' We have repeatedly held that
the unity required by this section is served notwithstanding the
existence of many provisions in an Act where such provisions
are germane to the general subject expressed. (*Hotchkiss* v.
*Marion,* 12 Mont. 218, 225, 29 Pac. 821; *State* v. *McKinney,* 29
Mont. 375, 1 Ann. Cas. 579, 74 Pac. 1095; *In re Terrett,* 34 Mont.
325, 331, 86 Pac. 266; *Carlson* v. *City of Helena,* 39 Mont. 82,
17 Ann. Cas. 1233, 102 Pac. 39.) ''No provision in a statute,''
says the supreme court of Missouri, ''having natural connection
with the subject expressed'' in it, ''is to be deemed within the
constitutional inhibition'' that no bill shall contain more than
one subject. (*Lynch* v. *Murphy,* 119 Mo. 163, 24 S. W. 774.)

So premising, we return to the amendment in question and
observe:

(a) That its submission was in manner and form as prescribed
[3] by the legislative assembly. (Laws 1905, p. 139 *et seq.*)
In this connection the language of the supreme court of Wiscon-
sin is apt: ''There can be no dispute that the two legislatures
which agreed to the proposition proceeded upon the theory that
the several propositions amounted to but one amendment of the
Constitution. They were all included in one resolution adopted
by the first legislature, and ratified   *   *   *   by the second as
one, and they declare it to be but one amendment.  *   *   *   We
also agree   *   *   *   that no amendment can be made to the Con-
stitution without complying with the provisions of section 1,
Article XII, above quoted, both in the passage of the amendment
by the legislatures and in the manner of the submission.  *   *   *
This provision can have but two constructions: First, it may be
construed   *   *   *   that every proposition in the shape of an
amendment to the Constitution which, standing alone, changes or
abolishes any of its present provisions, or adds any new provision
thereto, shall be so drawn that it can be submitted separately,
and must be so submitted. Such a construction would, we think,
be so narrow as to render it practically impossible to amend the
Constitution; or, if not practically impossible, it would compel
the submission of an amendment which, although having but one

object in view, might consist of considerable detail, and each separate provision, though all promotive of the same object and necessary to the perfection and practical usefulness thereof, if adopted as a whole, in such form that a defeat of one of its important matters of detail might destroy the usefulness of all the other provisions when adopted.  *  *  *  We think amendments to the Constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other.  *  *  *  We do not contend that the legislature, if it had seen fit, might not have adopted these changes as separate amendments and have submitted them to the people as such; but we think, under the Constitution, the legislature has a discretion, within the limits above suggested, of determining what shall be submitted as a single amendment, and they are not compelled to submit, as separate amendments, the separate propositions necessary to accomplish a single purpose.'' (*State* v. *Timme, supra.*)

(b) Only one provision of the Constitution was changed, to-wit, the provision by which the entire legislative authority of the state had been lodged in the legislative assembly. This fact is not of great importance, but it is important that but one change was made, *viz.*: To express a reservation of legislative authority in the people. That such authority could be used in two ways—designated, respectively, as the power to propose and enact laws, and the power to approve or reject laws enacted by the legislative assembly—does not suggest disconnection, but enumeration of the parts of a whole. Nor is the fact that a greater proportion of the electorate is required for the initiative than for the referendum necessarily significant of more than that one mode of using the reserved authority is deemed of greater value than the other. These provisions are purely detail, which might, without injury to the amendment, have been left for the legisla-

tive assembly to establish. So, too, the referendum, while in political effect a veto, is not such in the sense in which that term is used in our Constitution, and is not an invasion of the executive function. Under it the people proceed toward bills enacted by the assembly, expressing assent or dissent, in essentially the same manner as the Senate upon a bill which has passed the House; they are an additional body through which Acts of the legislature must pass in certain cases, and disapproval, when it occurs, is purely legislative.

(c) It is undoubtedly true that, as the amendment was submitted, persons who approved the initiative, and not the referendum, or *vice versa,* were obliged to take both or neither. But this circumstance is not fatal if they were both parts of a single plan or general purpose; such divergencies of opinion are conceivable as to any amendment involving particularization. "The unity of object is to be looked for in the ultimate end, and not in the detail or steps leading to the end." (*Lobaugh* v. *Cook, supra.*) In this connection the supreme court of South Dakota has spoken in terms which commend themselves to our judgment: "Does the resolution contain more than one amendment, within the meaning of the Constitution? It is contended with much apparent reason that two distinct objects were intended, namely, the abolition of the trustees and a change in the number and powers of the regents; that these objects are independent of each other; that either might have been adopted without adopting the other; and that there are numerous reasons why an elector might have desired one change, and not the other. The defect in this argument consists in substituting for the real object or purpose one of its incidents. Control of the state educational institutions is the subject to which the proposed amendment relates. Its purpose or object is to place such institutions under the control of a single board. The membership of such board, its powers, and the abolition of the local boards are but incidental to and necessarily connected with the object intended. Hence we conclude that only one amendment was submitted." (*State* v. *Herried, supra.*)

(d) After all is said, then, the question is an historical one. Much is made of the fact that the initiative is wholly foreign to our institutions, whereas the referendum has been with us, in one form or another, since early ages; but the referendum established by the amendment in question is the Swiss referendum, and is not the plebiscite resorted to in American practice from the earliest times for the settlement of constitutional or local questions; and while it is a fact that the initiative is the later invention, and does not prevail in all the communities which have the referendum, a very brief glance into political history will disclose that the initiative and the referendum came to us together and at a time when they were considered as essentially complementary. It will readily be recalled that for at least fifteen years prior to 1906 distrust of legislatures as truly representative of popular will was widespread, and there was vigorous agitation for a corrective. The press teemed with discussions of the initiative and referendum, always bracketed together, as a supposed panacea; many states adopted them as one, and there cannot be the slightest doubt that to the common understanding of our people they presented the aspect of a single plan to control the power of the legislature through the means of "direct legislation." (See Oberholtzer on Referendum, Chap. 15; Phelps on Initiative and Referendum.) By them, as the supreme court of California has said, the people reserved to themselves supervisory control of legislation (*In re Pfahler*, 150 Cal. 71, 76, 77, 11 Ann. Cas. 911, 11 L. R. A. (n. s.) 1092, 88 Pac. 270), they are the positive and negative poles of the same magnet—opposite sides of the same shield.

We are cited by the relator to many decisions upon this branch of the case, all of which we have carefully examined. Some of them are not in point; others, invoking principles not materially different from those expressed above, announce results which are manifestly correct; and all serve to illustrate the difficulties and doubts which sometimes surround the application of acknowledged principles to concrete causes. None of them furnish any warrant for us to say that, as a matter of law, the amendment

is clearly unconstitutional because of the method of submission, and we cannot pronounce it void on that account.

2. *Defective Publication.* (a) Publication of the proposed amendment was made but once a week, though in some instances [4] in daily papers and in others in semi-weeklies. The provision of the Constitution which requires publication is to be considered in the light of local history contemporaneous with its adoption. In 1889 there were few newspapers published daily in Montana. The weekly paper was the almost universal medium for the dissemination of current news or information, and when the framers of our Constitution provided for newspaper publication of any proposed amendment, it is but reasonable to suppose they contemplated the medium through which notice would then be given. If publication in a weekly paper in most of the counties would meet the demands of this constitutional provision, then publication for once a week in daily or semi-weekly papers would be sufficient for the same reason. It is to be observed that this provision for publication does not indicate the number of issues of the paper in which the proposed amendment must appear; neither does it designate the character of the paper as monthly, weekly, or daily. These matters were properly left to the control of the legislature or the discretion of the secretary of state, in the absence of legislative action.

Our Constitution is the charter of our government—the body of rules and maxims in accordance with which the powers of sovereignty are exercised. "Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they · must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument,

and usurping the proper province of ordinary legislation.''
(Cooley's Constitutional Limitations, p. 114.)  Of necessity, the
terms employed in the Constitution are general, and, under the
provision requiring publication, a wide latitude is allowed to
the secretary of state for the exercise of his discretion.  Further-
more, there prevails throughout our theory of state government,
as exemplified by the Constitution, the principle of uniformity
in all public matters and proceedings wherever possible, and, in
the absence of express requirement that the publication shall
occur oftener than once a week, control of the subject was refer-
able to the sound discretion of the secretary of state.  His adop-
tion of a uniform system of weekly publications, in the absence
of any intimation that there was the slightest abuse of discretion,
must be held to meet fully the demands made upon him.  Under
a like constitutional provision this same conclusion was reached
in *Hammond* v. *Clark,* above.

(b) *Publication on Sunday.*  The publication of the proposed
[5]  amendment in the Sunday issue of one paper did not viti-
ate the notice.  ''The common law of England, so far as it is not
repugnant to or inconsistent with the Constitution of the United
States, or the Constitution or laws of this state, or of the Codes,
is the rule of decision in all the courts of this state.''  (Rev.
Codes, sec. 3552.)  It was the rule at common law that Sunday
was *dies non juridicus,* but the prohibition involved extended
only to acts strictly judicial in character.  It had no application
whatever to ministerial acts.  (27 Am. & Eng. Ency. of Law,
2d ed., 389; 37 Cyc. 583, and numerous cases cited.)  In this
state Sunday is a legal holiday.  (Rev. Codes, sec. 6217.)  It
has no other distinguishing characteristic in law.  In the ex-
ercise of its police power, the state has forbidden certain
acts to be done on that day, as, for instance, barber-shops to
be open for business.  There is not any prohibition against
the performance of any public act on Sunday, as such.  Every
holiday—including every Sunday—is qualifiedly a nonjudicial
day (Rev. Codes, sec. 6296) ; but the prohibition of the statute
extends only to strictly judicial acts, and some of them are ex-
cepted.  In the absence of a prohibitory statute, the rule of the

common law prevails, and any ministerial act, such as the publication of the amendment in question, could be done on Sunday and as efficaciously as if done on any other day. (*Heisen* v. *Smith,* 138 Cal. 216, 94 Am. St. Rep. 39, 71 Pac. 180.)

In the early case of *Hauswirth* v. *Sullivan,* 6 Mont. 203, 9 Pac. 798, it was held that valid service of a summons could not be made on Sunday, but this was overruled when the like question again presented itself in *Burke* v. *Interstate S. & L. Assn.,* 25 Mont. 315, 87 Am. St. Rep. 416, 64 Pac. 879.

Counsel for relator cite *Ormsby* v. *Louisville,* 79 Ky. 197, *Scammon* v. *Chicago,* 40 Ill. 146, *Shaw* v. *Williams,* 87 Ind. 158, 44 Am. Rep. 756, *Sawyer* v. *Cargile,* 72 Ga. 290, and *Sewall* v. *City of St. Paul,* 20 Minn. 511 (Gil. 459), as supporting their contention; but every one of these cases was decided upon a particular statute held to prohibit the act in question on Sunday. Such cases are not even precedents here, where we do not have such a statute. They also direct our attention to *Schwed* v. *Hartwitz,* 23 Colo. 187, 58 Am. St. Rep. 221, 47 Pac. 295, but the Colorado court is in direct conflict with our own holding in the *Burke Case* above. The decisions of courts of other states are not binding upon us. Precedents are valuable or invaluable as they appeal to our reason, on the one hand, or fail to do so, on the other. We prefer to adhere to the doctrine announced by our own court in the *Burke Case,* as clearly correct in principle and having the support of the decided weight of authority.

Counsel for relator err in assuming that we have an austere statute prohibiting publication of this character on Sunday. They cite section 6220, Revised Codes, identical with section 12 of the same Codes. Each of those two sections reads as follows: "Whenever any act of a secular nature, other than a work of necessity or mercy, is appointed, by law or contract, to be performed upon a particular day, which day falls upon a holiday, it may be performed upon the next business day, with the same effect as if it had been performed upon the day appointed." Instead of embodying a prohibition, this statute merely provides an extra day of grace. Any of the enumerated acts may be done

lawfully on a holiday, but are in time if not done until the next business day.

(c) It is charged that certain publications ran for less than three months, and certain ones ceased several days before election day. Whether the publication in the last issue of a weekly paper runs forward and serves the purpose of giving continuous notice for the ensuing seven days until the next regular day of publication, or whether the publication is complete for all purposes of imparting notice, upon the day the last issue comes off the press, is not of sufficient consequence at this time to deserve special consideration. Also, for the purposes of this proceeding, it may be admitted that the constitutional requirement for three months' publication previous to the election refers to the three-month period immediately preceding election day; and it may be conceded, further, that in the two respects now under consideration the publication of this proposed amendment in several of the counties was not according to the strict letter of the law, as declared by the Constitution itself in section 9, Article XIX. It would not, however, be argued by anyone that there was not a substantial compliance in every particular, so that, after all, the serious question presented is one of construction.

In the absence of any declaration upon the subject, we would be inclined to hold that, from the very nature of the document itself, every provision of a state Constitution positive in form is mandatory, but in this state we are not left in doubt. "The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." (Mont. Const., Art. III, sec. 29.)

The provision for publication of a proposed amendment falls within the general rule, and, because of this fact, it is insisted that nothing less than an absolute, literal compliance will suffice. [6] If this canon of construction be adopted, the amendment under consideration must fail; but law is supposed to be the perfection of reason, and any rule which either offends against every dictate of common sense, or defeats the very object of the provision to which it is applied, ought not to be adopted.

The purpose of requiring publication is manifest: To impart notice to the electors that their fundamental law is sought to be changed, and, as well, the extent of the change. The purpose in requiring such notice to be given immediately before election day is to keep the fact of the proposed change fresh in the minds of those called upon to effect or defeat it at the polls. The section of the Constitution now under immediate consideration, reads as follows: ''The secretary of state shall cause the said [7] amendment or amendments to be published in full in at least one newspaper in each county (if such there be) for three months previous to the next general election.'' (Section 9, Art. XIX.)   Must this provision be complied with to the very letter? An illustration or two will suffice to demonstrate the absurdity of applying the rule of *literal compliance:*

(a) Assume that there was absolute compliance with the language above in every county save one, and in that one there was a *bona fide* intention to make the same strict compliance, but on the day of the last publication, which occurred on the day before election, after the type had been set, the forms all arranged, and the presses ready to start, lightning should set fire to the building and destroy the entire plant. Because of this act of God there was not full three months' publication in that one county, and yet, according to the rule or literal compliance, the amendment would fail, even though every qualified elector in that county had notice and actually voted in favor of the amendment.

(b) Again, the amendment must not only be published, but published *in full.* The rule of literal compliance will not permit the omission of a single sentence, phrase, or word. Let us assume again the facts in the illustration above, except that instead of the intervention of an act of God, a careless printer had omitted the word ''all'' in paragraph 5 of the amendment under consideration, beginning, ''All elections on measures referred to the people,'' *etc.,* and in the last issue of the paper before election that paragraph was made to commence, ''Elections on measures referred to the people,'' *etc.*   The omission does not change the meaning of the sentence in the least, and

yet the omission of this single word in a single paper for a single issue prevents a compliance with the very letter of the constitutional provision above, and would, under the rule of literal compliance, defeat the amendment, even though it was adopted by an overwhelming vote and the defect was not discovered for years afterward.

(c) Indeed, to reach the very acme of absurdity, we need only say that the rule of literal compliance requires that every word be spelled correctly, and if in the last illustration the printer inadvertently omitted the letter "a" from the word "measures," and this was the only departure, the amendment would fail under the rule in question. A court which would nullify the expressed will of the people upon such a flimsy pretext as any one illustrated above would deservedly forfeit every claim to the respect or confidence of the community.

But the enforcement of such a rule would also defeat the very purpose of the provision under consideration. Our Bill of Rights declares: "The people of the state have the sole and exclusive right of governing themselves, as a free, sovereign and independent state, and to alter and abolish their Constitution and form of government, whenever they may deem it necessary to their safety and happiness, provided such change be not repugnant to the Constitution of the United States." (Const., Art. III, sec. 2.)   Section 9, Article XIX, deals with but one subject—amendments to the Constitution. In its adoption it was not the purpose of the people to render their fundamental law incapable of change, but, on the contrary, to provide a plain, simple and easily executed method of amendment.

So long as human agencies are to be employed in carrying out the constitutional scheme of amendment, slight errors and defects in procedure are certain to occur, and to impose the rule of literal compliance would, for all practical purposes, render the adoption of any amendment absolutely impossible and defeat one of the very purposes of the Constitution itself. We ought not, by any strained construction, make the language of our Constitution mean something altogether different from what the

people had in contemplation in its adoption. No rule of construction should be invoked which will trammel the people in their efforts to exercise the right reserved to themselves to change their Constitution by popular vote.

In speaking of a slight deviation from the constitutional method of proposing an amendment, the supreme court of Mississippi said: "This objection would have more force if the Act of itself operated as an alteration of the Constitution. But it is merely a *proposition* to be submitted to the action of the people. It is a means provided by which the people may exercise their sovereign right of declaring whether they will change their Constitution or not, thereby establishing the mode in which the government shall be changed, instead of leaving it to unregulated popular impulse. The proposition is presumed to emanate from the people, through their representatives, and is regularly submitted for the action of the whole people. There is nothing in the nature of the submission which should cause the free exercise of it to be obstructed, or that could render it dangerous to the stability of the government; because the measure derives all its vital force from the action of the people at the ballot-box, and there can never be danger in submitting, in an established form, to a free people, the proposition whether they will change their fundamental law. The means provided for the exercise of their sovereign right of changing their Constitution should receive such a construction as not to trammel the exercise of the right. Difficulties and embarrassments in its exercise are in derogation of the right of free government, which is inherent in the people; and the best security against tumult and revolution is the free and unobstructed privilege to the people of the state to change their Constitution in the mode prescribed by the instrument." (*Green* v. *Weller,* 32 Miss. 650.)

If publication of a proposed amendment was one of the successive steps in its adoption, or if universal notice of the proposed amendment throughout the state before election was the *sine qua non* to the valid adoption of such amendment, then some foundation would be laid for argument that the slightest

defect in publication would defeat the effort to amend; but neither of these premises can be insisted upon. The only purpose of publication is to give notice to the electors, and the framers of our Constitution in preparing the draft for submission, and the people in adopting it with a full realization of the fact that they were prescribing only general rules and remitting matters of detail to the legislature or to the discretion of the proper officer, wisely left a margin to cover the frailties of human nature as well as defective machinery for giving notice. Nothing whatever is said as to the number of issues of the newspapers in which the proposed amendment must appear; nothing as to the character of the paper, whether of general or extremely limited circulation, or whether a monthly, weekly or daily; and finally, no provision whatever was made for giving any notice at all to the people of an entire county, if, perchance, there should be such county, in which a newspaper was not published. Since notice was the sole object of publication, all these matters of detail were wisely left for control by legislation or official discretion.

The proper proposal of the amendment by the legislature and the will of the people expressed at the polls in favor of such amendment are clearly emphasized as the factors of paramount importance in effecting a change of our Constitution. (*Constitutional Prohibitory Amendment Cases,* 24 Kan. 700.) Whatever may be said of the rigidity with which the rules of law must be drawn whenever either of these paramount factors is in issue, we are clearly of the opinion that any question which may arise upon other features of the amending process is referable to the rule of substantial compliance, even though the provision of the Constitution invoked is mandatory.

Much confusion has arisen by assuming that every mandatory provision requires literal compliance, while a directory provision only is satisfied with substantial compliance. The terms "mandatory" and "directory" are employed in the same sense, whether applied to statutes or to constitutional provisions. The entire disregard of a provision would not necessarily invalidate

action taken under it if directory, but would if it was mandatory. (Cooley's Constitutional Limitations, p. 109; 36 Cyc. 1157; *Custer County* v. *Yellowstone County,* 6 Mont. 39, 9 Pac. 586.) Any intimation to the contrary in *Evers* v. *Hudson,* 36 Mont. 135, 92 Pac. 462, is merely *dictum.*

In Abbott's Law Dictionary we find this exposition of the words "mandatory" and "directory": *"Mandatory.* The principal technical use of this word is in distinguishing statutes which must be obeyed according to the substantial import of their terms under sanction of having the Act or proceeding adjudged void, from those which ought indeed to be obeyed, but, if disobeyed, do not invalidate what is done under them; which latter class of enactments are called directory.'' (Abbott's Law Dictionary, 78.)

In *Purdum* v. *Laddin,* 23 Mont. 387, 59 Pac. 153, this court, in considering section 3612, Political Code of 1895, said: ''The statute is mandatory, and substantial compliance with its provisions is necessary.''

In *Walker* v. *Pennington,* 27 Mont. 369, 71 Pac. 156, we said: ''In the judgment of this court the decision in the case of *Purdum* v. *Laddin,* above, has little or no application to the facts in this case; but, so far as the statement contained therein to the effect that the provisions of section 3612, above, are mandatory, and that substantial compliance therewith is necessary to perfect a valid location, is concerned, we have no hesitancy in here reaffirming it.''

The rule that substantial compliance with the mandatory provisions of the Constitution for its own amendment is sufficient in the absence of any intimation that injury—substantial or unsubstantial—resulted was adopted by the supreme court of Kansas in *Constitutional Prohibitory Amendment Cases,* above, and by the supreme court of Georgia in *Hammond* v. *Clark,* above.

If these attacks had been made upon the proceedings prior to the election of 1906, doubtless they would have prevailed (*Potter* v. *Furnish,* 46 Mont. 391, 128 Pac. 542); but the general rule

is that every reasonable intendment will be indulged in favor of
[8] the validity of a constitutional amendment after its ratifi-
cation by the people at the polls. (*People* v. *Sours*, 31 Colo.
369, 102 Am. St. Rep. 34, 74 Pac. 167.)

In *State ex rel. Woods* v. *Tooker*, 15 Mont. 8, 25 L. R. A. 560,
37 Pac. 840, the proposed constitutional amendment under con-
sideration was published but two weeks. The opinion delivered
by the court, though covering more than nine printed pages, goes
no further than to hold that the provision for publication is
mandatory, and that, because the proposed amendment was pub-
lished but two weeks, it was not legally adopted. No one would
contend that two weeks' publication substantially meets the re-
quirement for three months' publication; on the contrary, no
one can seriously insist that in every detail the proceedings for
publication of the initiative and referendum amendment did not
substantially comply with the requirements of section 9, Article
XIX, above.

The election returns of 1906 disclose that the proposed amend-
ment was adopted by a vote of 5.5 to 1. That proportion was
maintained or exceeded in every county where the publication
is called in question, excepting in Cascade, Fergus, and Park
counties. The vote in those counties follows:

| Counties. | For. | Against. |
|---|---|---|
| Beaverhead | 1050 | 135 |
| Cascade | 2486 | 883 |
| Deer Lodge | 1346 | 105 |
| Fergus | 1666 | 494 |
| Gallatin | 1856 | 343 |
| Lewis and Clark | 2712 | 446 |
| Missoula | 1087 | 147 |
| Park | 1431 | 412 |
| Silver Bow | 7783 | 1211 |
| Yellowstone | 1128 | 194 |

When the proclamation of the Governor was made after the
election in 1906, the initiative and referendum amendment be-
came *prima facie* a part of the Constitution of this state (*State*

*ex rel. Teague* v. *Board,* above), and it ought not now to be set aside and declared inoperative for mere technical departures from the letter of the law, which, in view of the vote cast upon the amendment, could not have affected any substantial right either of this relator or anyone else.

The order to show cause is discharged and this proceeding is dismissed.

*Dismissed.*