**WHITESIDE et al. v. BROWN et al.**

No. 9754.

Court of Civil Appeals of Texas. Austin.

Oct. 20, 1948.

Rehearing Denied Nov. 10, 1948.

Carter, Gallagher & Barker, of Dallas, for appellants.

Price Daniel, Atty. Gen. of Texas, and Joe Greenhill and Jesse P. Luton, Asst. Attys. Gen., for appellees.

HUGHES, Justice.

Two suits were filed in the court below having as their common purpose the invalidation of an amendment to the State Constitution known as the State College Building Program Constitutional Amendment, which amendment, having received a favorable majority of the votes at a special election held August 23, 1947, was proclaimed adopted by the Governor of Texas on September 8, 1947. Vernon's Ann. St. Const. art. 7, §§ 17, 18. The two suits were consolidated for trial.

Appellants, who brought the two suits, are Clarence Whiteside, S. A. Wells, Homer Maxey, and H. E. Speer, all residents of the State of Texas, and all of whom are qualified voters and own real estate subject to the ad valorem tax laws of this State.

Appellees are the Hon. Price Daniel, Attorney General, and the Hon. Paul Brown, Secretary of State.

Analysis of the pleadings in the two suits is not required for a decision of the questions presented.

Appellants, by their first two points, challenge the validity of the election on the ground that no notice of the election by publication, as required by the Constitution, was given in six of the two hundred and fifty-four counties in Texas, and that the publication notice made in other counties was irregular.

Provision for the publication of notice as contained in Sec. 1, art. 17, of

our Constitution, reads: " * * * which proposed amendments shall be duly published once a week for four weeks, commencing at least three months before an election, the time of which shall be specified by the Legislature, in one weekly newspaper of each county, in which such a newspaper may be published; * * * ."

The six counties in which no notice was published are: Bexar, El Paso, Galveston, Hill, Moore and Taylor.

The combined vote cast in these counties was 16,015 for the amendment and 9,657 against the amendment. If the votes in these six counties are excluded the amendment fails.

The Joint Resolution proposing this constitutional amendment was finally passed by the legislature April 22, 1947, and approved by the Governor May 5, 1947. Gen. and Special Laws, 50th Leg., p. 1184.

On May 8[1] the Secretary of State, after having ascertained the name and address of one newspaper in each of the 254 counties in Texas, mailed each of such papers a letter fully explaining the publication desired and attached a full copy of the notice. Immediate reply was requested as to whether or not the paper desired to make the publication, and a stamped and appropriately worded self-addressed post card was enclosed for this purpose.

Not having heard from the paper selected and written to in El Paso County, the Secretary of State wired the publisher on May 17, who replied on the same date that he had not received the letter of May 8. A duplicate letter was forwarded by the Secretary of State on May 19, and a reply was received by him on May 23, advising that due to the shortage of newsprint the publication could not be made at that time. No further effort was made by the Secretary of State to publish the notice in El Paso County.

In Galveston County, no reply having been received to the letter of May 8, the Secretary of State wired the selected publisher and a reply was received May 19 stating the letter of May 8 could not be located. On the same day the Secretary of State sent a copy of the lost letter and also included an authorization for publication of the notice. On July 26 and August 13, the Secretary of State wrote the Galveston publisher to return affidavits showing publication. Similar request was made on August 22. On August 26 the Secretary of State was informed by the Galveston paper that no publication was made because the rate of pay offered was too low.

In Bexar County the publisher selected to make the publication informed the Secretary of State on May 19 that it would be unable to publish the notice because of shortage of space and unsatisfactory rate of pay. On the 19 and 20 of May the Secretary of State attempted to call another newspaper in Bexar County by telephone, but was unsuccessful.

In Moore County the paper selected to make publication notified the Secretary of State on May 12 that it desired to publish the notice and then on May 24 it advised the Secretary of State that through an oversight the notice was not published.

Publication was not made in Hill County because the publisher, after receiving the letter of May 8 and answering that it desired to make the publication, did not proceed because of failure to receive authority from the Secretary of State. This information was given to the Secretary of State by letter of June 9 and in reply thereto the Secretary of State advised that he had mailed authorization on May 20.

In Taylor County the publisher, after indicating on May 10 that it desired to make the publication, notified the Secretary of State on or about August 15 that the publication had not been made.

It appears that in addition to the papers selected by the Secretary of State to make publication in the six counties where no publication was made, there were other papers eligible to publish the notice in five of such counties.

Literal compliance with the constitutional provision as to notice, in this instance, required that publication of the notice commence not later than May 23.

---

[1] (All dates are 1947, unless otherwise indicated.)

Publication irregularities complained of are:

Publication of the notice was commenced late as follows: Harris County one day; Nacogdoches County six days; Angelina County seven days (the reason here being shortage of newsprint for the preceding week); Wichita County one day; Gregg County six days (the reason for delay being that although the amendment was received several days before May 23 there was insufficient time to set the notice accurately in six point type).

The publication made in Cherokee County was timely, but there was omitted therefrom the last paragraph in Sec. 3 of the Joint Legislative Resolution, supra, being the negative proposition directed placed upon the ballots.

In Coryell County the publication was timely, but "hereinabove" and "equipping" were spelled "hereinnabove" and "equiping", respectively; also that in three of the four publications made, one line was dropped and inserted eight lines below where it should have appeared.

█ As to the publication in Yoakum County, appellants say that it was "irregular and did not conform to the true text of S.J.R. 4." This objection is too indefinite to warrant consideration. However, we have examined a copy of the notice and find that it is intelligible and contains a full and fair statement of the subject of the notice.

█ In the notices published in thirty-four counties the following words were in bold type: "For the Amendment to Article VII," and the following words were printed in ordinary type: "Against the Amendment to Article VII"; and in eleven counties the words quoted first above were printed in capital letters and the words quoted second above were printed in regular type.

All of the objections or defects listed above, except those which relate to the failure to publish notice at all or the failure to publish in time, are considered trivial and they are dismissed without further comment.

█ It is the general rule that election laws, even though mandatory in form, are construed as directory in the absence of fraud or statutory provision voiding the ballot or election for failure to comply with the statute. Thomas v. Groebl, Tex. Sup., 212 S.W.2d 625, and authorities therein cited. See also Orth v. Benavides, Tex.Civ.App., San Antonio, 125 S.W.2d 1081, Writ Dis.

The difference here is that a constitutional provision, and not a statute is involved. Appellant cites Cooley on Constitutional Limitation, 8th Ed., pages 154-164, and other authorities, including Hunt v. State, 22 Tex.App. 396, 3 S.W. 233, for the rule that all provisions of a constitution are mandatory.

It may well be doubted that this rule obtains in Texas insofar as constitutional provisions pertaining to elections are concerned, in view of the decision in Markowsky v. Newman, 134 Tex. 440, 136 S.W. 2d 808, and the comment thereon made by the Supreme Court in Thomas v. Groebl, supra [212 S.W.2d 630], which we quote: " * * * despite the provision of Section 3a of Article VI of the Constitution, adopted November 8, 1932, defining as qualified voters in an election for the issuance of bonds only those owning taxable property 'who have duly rendered the same for taxation', and the provision of article 1043 of the statutes, as amended in 1934 [Vernon's Ann.Civ.St. art. 1043], that the property owner 'shall, between January first and April first of each year' render his property for taxation, the court held Article 1043 to be directory and not mandatory; and that property owners otherwise qualified were entitled to vote even though they had not rendered their property until after April first."

█ It is unnecessary for us to determine if the constitutional provision under consideration is directory, because we are convinced that even though it be deemed mandatory, that substantial and not literal compliance is sufficient to satisfy its demand.

In Houchins v. Plainos, 130 Tex. 413, 110 S.W.2d 549, 554, a case involving construction of a provision of the Constitution, the court said: "It is the intention of a legislative act that governs, and statutes are often given an interpretation or

construction not in technical accord with the literal words used. Courts will not follow the letter of a statute where to do so would violate the purpose of the act, and lead to a conclusion contrary to its evident intent. * * * In Travelers' Insurance Company v. Marshall, supra, [124 Tex. 45, 76 S.W.2d 1007, 96 A.L.R. 802], Chief Justice Cureton, speaking for this court, reviewed the authorities on this question at great length, and in effect applied the above rules to the interpretation of constitutional provisions. In that opinion it was expressly held that courts should consider the history of the times out of which a constitutional provision grew, the evils intended to be remedied, and the good sought to be accomplished in interpreting constitutional provisions."

■ Certain it is that the framers of our Constitution did not intend to provide for and to preserve to the people the fundamental right of amending or changing the Constitution and at the same time to surround the exercise of this right with restrictions which would empower one private publisher to bring about the defeat of a contitutional amendment, approved by the people, by the simple expedient of failing or refusing to publish notice of the election as required by the Constitution. The Constitution, itself, recognizes that publication of the notice in every county is not vital to the right of the people to amend because it expressly provides that publication need not be made in counties having no newspaper.

Only one Texas case (Manos v. State, 98 Tex.Cr.R. 87, 263 S.W. 310, 311) has been cited as applying the rule of substantial compliance to this provision of the Constitution. The objections there were that notice of the election had been published in one county for only three weeks and in four counties publication was commenced less than three months before the date of the election, and in one county publication was made in a daily paper instead of a weekly. In upholding the amendment Judge Morrow said: " * * * It will be observed that there was an effort to comply with the provisions of the Constitution with reference to the publication of the notice in each of the counties of the state. The record does not suggest that the irregularities mentioned arose from any willful or fraudulent conduct. The supposed irregularity in making the publication in a daily paper of general circulation is not regarded as important. The purpose of the Constitution was thereby met, and the deviation resulting from the selection of a daily rather than a weekly paper was a substantial compliance with the requirement."

This case is distinguished by appellants on the ground that eliminating the votes in the counties where publication was irregular, the amendment was not defeated.

Cases in other jurisdictions which have considered this question and announced what we conceive to be the correct rule are: Tausig v. Lawrence, 1938, 328 Pa. 408, 197 A. 235; Herold v. Townsend, 1933, 113 W.Va. 319, 169 S.E. 74; Constitutional Prohibitory Amendments Cases, 1881, 24 Kan. 700; Hildreth v. Taylor, 1915, 117 Ark. 465, 175 S.W. 40; State v. Alderson, 1914, 49 Mont. 387, 142 P. 210, Ann.Cas. 1916B, 39; State v. Winnett, 1907, 78 Neb. 379, 110 N.W. 1113, 10 L.R.A.,N.S., 149, 15 Ann.Cas. 781; Madronah Sales Co. v. Wilburn, 1935, 180 Ga. 837, 181 S.E. 173; Doody v. State, 1936, 233 Ala. 287, 171 So. 504; Gaines v. O'Connell, 1947, 305 Ky. 397, 204 S.W.2d 425; State v. Smith, 1934, 335 Mo. 840, 74 S.W.2d 27.

The above cases, in our opinion, are well reasoned and based upon sound logic. The rationale of the decisions is contained in the following excerpt from State v. Alderson, supra [49 Mont. 387, 142 P. 216]: "So long as human agencies are to be employed in carrying out the constitutional scheme of amendment, slight errors and defects in procedure are certain to occur, and to impose the rule of literal compliance would, for all practical purposes, render the adoption of any amendment absolutely impossible and defeat one of the very purposes of the Constitution itself. We ought not, by any strained construction, make the language of our Constitution mean something altogether different from what the people had in contemplation in its adoption. No rule of construction should be invoked which will trammel the people in their efforts to exercise the right reserved

to themselves to change their Constitution by popular vote."

The Joint Resolution proposing the constitutional amendment was approved by the Governor on May 5, 1947. Three days later the Secretary of State mailed to a publisher in each of the State's 254 counties a copy of the amendment and details of the desired publication. The facts regarding the counties in which publication was not made or was defectively made have already been set out in full and will not be repeated. They do not disclose any fraud or negligence on the part of the Secretary of State or any other public official. They do not disclose design on the part of any one to deceive, mislead or perpetrate fraud upon a single voter in the State of Texas. There is no evidence or intimation that the matters complained of affected any person who voted or did not vote in the election.

The notice was actually published in 248 of the 254 counties, a percentage of 97.6 It was published from one to seven days late in five counties. If these counties are added to the six counties in which no publication was made, the publication was 95.7% complete.

The evidence shows that in some of the counties where no publication was made notices of the election were posted in the voting precincts, news stories were carried in the local press concerning the election, and radio addresses were made for and against the amendment. Few people in rural counties depend upon the local weekly for state and world news. Through the medium of radio and large daily papers they keep abreast of current events. That this election was no surprise to the people in counties where no publication was made is illustrated by the vote in Galveston and El Paso Counties. In El Paso County there were 21,648 qualified voters, 8,971 of whom participated in this election, yet in August 1945, in a special constitutional amendment election, only 3,544 votes were cast, and at a similar election held in 1946 only 335 persons voted.

In Galveston County 8,806 votes out of a possible 25,255 were cast in this election. In 1945, at a special constitutional amendment election, only 1,077 votes were cast

and at a similar election held in 1946 only 831 votes were cast.

[6] In our opinion this record discloses that the constitutional provision involved has been substantially complied with and we, therefore, overrule the two points under consideration.

Appellants' third and fourth points will be considered together. They relate to the form of the ballot used in the election; it being contended that (1) the ballot was in the form of one amendment, whereas, in fact, several distinct amendments were being proposed which should have been submitted and voted upon separately; and (2) the ballot used did not contain a sufficient description of the proposed amendment.

The ballots used were in the following form: "For the amendment to Article VII of the Constitution of the State of Texas, adding Sections 17 and 18 providing for the levying of a state ad valorem tax on property in lieu of the present state ad valorem tax of Seven (7¢) Cents for Confederate pensions in order to create special funds necessary for the payment of Confederate pensions and for the financing of the construction and equipment of buildings and other permanent improvements at state institutions of higher learning, in the amounts of Two (2¢) Cents and Five (5¢) Cents respectively; providing for a Five Cent reduction of the maximum allowable state tax on property, making such tax not to exceed Thirty (30¢) Cents on the One Hundred ($100.00) Dollars valuation; providing a method of payment for the construction and equipment of improvements and buildings at the Agricultural and Mechanical College of Texas and The University of Texas."

The converse of the proposition is identical except that the first word is "Against."

This form of the ballot was prescribed by S.J.R. 4, supra.

Art. 17, Sec. 1, of the State Constitution prescribes the method by which the Legislature may propose "amendments" to the Constitution and makes it the duty of election officers to make returns to the Secretary of State of the number of legal

votes cast for and against "said amendments; and if more than one be proposed, then the number of votes cast for and against each of them; and if it shall appear from said return, that a majority of the votes cast, have been cast in favor of any amendment, the said amendment so receiving a majority of the votes cast, shall become a part of this Constitution * * *."

Art. 2982, Vernon's Ann.Civ.St., provides that when more than one proposed constitutional amendment is submitted at one election the Secretary of State shall number each proposal, the numbers to be determined by lot.

█ Appellants' position is that the ballot used was in violation of the above constitutional and statutory provisions. If more than one amendment was proposed, then appellants are correct. We find, however, no guide or definition in either the Constitution or statutes which is helpful in determining whether more than one amendment was proposed.

Art. 3, Sec. 35, of the Constitution provides that no legislative bill, except appropriation bills, shall contain more than one subject.

Significantly, it seems to us, there is no such limitation upon proposed amendments to the Constitution. To limit a constitutional amendment to one subject would be to place a restriction upon the right of the legislature to propose and the people to adopt an amendment to the Constitution which is not contained in such document.

It is true that the amendment before us could have been broken up into several distinct propositions or issues, as suggested by appellants. This would probably be true of many proposed amendments to the Constitution. Certainly it has been true of many amendments made in the past.

The Constitution has vested in the legislature a discretion as to the form in which constitutional amendments may be proposed and submitted to the people.

Perhaps this discretion is subject to abuse, but if so, we find none here.

The different subjects or issues, referred to by appellants,—

"1. Whether the ad valorem tax for confederate pension purposes should be reduced from .07c to .02c on the $100.00 valuation.

"2. Whether a special ad valorem tax of five cents on the $100.00 valuation should be levied for college building purposes.

"3. Whether the general ad valorem tax should be lowered from thirty-five (35c) cents to thirty cents (30c) on the $100.00 valuation.

"4. Whether the University of Texas and A. &. M. College should be permitted to issue bonds for building purposes to be refunded out of income from the permanent University funds.

"5. Whether the fourteen other state colleges in the State of Texas should be permitted to issue bonds for building purposes payable out of a special five cent ad valorem tax and whether such fourteen state colleges should be prohibited from thereafter receiving any other state funds (except out of such special five cent ad valorem tax) for a period of thirty years." are all interrelated and germane to the general purpose and object of the amendment which was to provide the colleges and universities of this State with a financial plan for a long term building program. This is easily demonstrated.

The .07¢ ad valorem tax for Confederate pensions is no longer required. By the amendment it was reduced to .02¢, and, in lieu of the .05¢ remitted, a tax of like amount was authorized for college building purposes.

The general ad valorem tax of 35¢ was reduced to 30¢ because the legislature would not be called upon to make appropriations for college buildings since the amendment prohibits such appropriations, except in certain emergencies or from the special five-cent tax, for a period of thirty years.

The University of Texas and A. & M. College were provided for in their building needs by being permitted to issue bonds refundable out of income from the Permanent University Fund.

The plan of the amendment was comprehensive, closely knit, and each major

provision dependent upon the other. It was for the people of Texas to say whether it was wise or unwise.

The ballot did not disclose that the proposed amendment prohibited the various colleges from receiving state funds for building purposes for thirty years, except under certain circumstances, and for this reason appellants contend it was insufficient and the election invalid.

Art. 2982, which appellants cite as controlling, provides: "When a proposed constitutional amendment or other question submitted by the Legislature is to be voted on, the form in which it is submitted, if the Legislature has failed to prescribe the same, shall be prescribed by the Governor in his proclamation, describing the same in such terms as to give a clear idea of the scope and character of the amendment in question."

Since the legislature prescribed the form of submission in S.J.R. 4, supra, this Article, strictly speaking, is not applicable, although it would seem that the legislature should be governed by the same standard required of the Governor.

 The above statute excludes the idea that a proposed constitutional amendment shall be printed in full upon the ballot. Accordingly, the general rule is that the ballot is sufficient if enough is printed to identify the amendment and show its "character and purpose." 29 C.J.S., Elections, § 170, page 245, 18 Am.Jur., p. 298.

The words "character and purpose," as here used, have substantially the same meaning as "scope and character" as used in art. 2982, since the definition of "scope" in the sense employed in such statute is: intent, import, subject matter, theme.

In our opinion the proposed amendment was submitted in conformity with the directive contained in art. 2982 and the general rule, above stated.

The primary object of the amendment, as disclosed by the ballot, was to rearrange and levy taxes for the purpose of financing the construction and equipment of buildings and other permanent improvements at state institutions of higher learning. This was its intent, import, theme and subject matter, and, hence, its scope.

Some of the details and provisions, including the one to which appellants direct our attention, were omitted. This is a necessary consequence of the failure to print the amendment, in extenso, upon the ballot. It must have been presumed that the voter would familiarize himself with the contents of the proposed amendment before entering the ballot box, otherwise the legislature would have required a full copy on the ballot.

It is not shown that any voter was misled or deceived by the form of submission of this amendment. No one who had previously read the amendment could have been misled or deceived by the ballot used.

We, therefore, overrule appellants' third and fourth points.

Finding no error, the judgment of the trial court is affirmed.

Affirmed.