

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-23-00031-CV

---

JANE NELSON, IN HER OFFICIAL CAPACITY AS
TEXAS SECRETARY OF STATE, APPELLANT

V.

TRUE TEXAS PROJECT, TEXANS UNITING FOR REFORM AND
FREEDOM, GRASSROOTS AMERICA - WE THE PEOPLE, JULIE
MCCARTY, TERRI HALL, AND JOANN FLEMING, APPELLEES

---

On Appeal from the 53rd District Court
Travis County, Texas
Trial Court No. D-1-GN-21-006656, Honorable Lora J. Livingston, Presiding

---

January 25, 2024

OPINION[1]

Before QUINN, C.J., and PARKER and DOSS, JJ.

Jane Nelson, in her official capacity as Texas Secretary of State, appeals the trial court's order denying her plea to the jurisdiction in an election contest filed by True Texas Project, Texans Uniting for Reform and Freedom, Grassroots America – We the People,

---

[1] The Supreme Court transferred this appeal from the Third Court of Appeals. Thus, we are bound by the latter's precedent when conflicting with ours. TEX. R. APP. P. 41.3

Julie McCarty, Terri Hall, and Joann Fleming, collectively referred to as McCarty. We affirm.

***Background***

The substance of the election contest focuses on the ballot language used to identify and describe a proposed constitutional amendment allowing counties to fund various projects. Voters rejected a like proposition years earlier. The subject was again put to a vote in November 2021. This time the ballot described the amendment as follows: "The constitutional amendment authorizing a county to finance the development or redevelopment of transportation or infrastructure in unproductive, underdeveloped, or blighted areas in the county." It met with voter approval. Nevertheless, McCarty initiated this election contest to nullify the vote.

McCarty sued because the November 2021 ballot allegedly was "incomplete, inaccurate, and did not adequately describe what the electorate was actually voting on." This was so, in her view, because ballot language failed to include all chief characteristics of the proposed constitutional amendment. That led to Nelson's filing her plea to the trial court's jurisdiction and the trial court's subsequent rejection of that plea.

Before us, Nelson contends that the doctrines of separation of powers and political question bar the trial court from adjudicating the controversy. The topic of standing has also been broached, for the first time. It relates solely to True Texas Project, Texans Uniting for Reform and Freedom, and Grassroots America – We the People (the organizations). Allegedly, they lack standing to prosecute the contest under § 233.002 of the Election Code.

2

### *Separation of Powers*

We begin with separation of powers. Our Texas Constitution states that "the powers of the Government of the State of Texas shall be divided into three distinct departments . . . and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." TEX. CONST. art. II, § 1. The three "departments" are the executive, legislative, and judicial. *Id.* Yet, the separation alluded to does not denote absolute independence between the branches but, rather, a degree of interdependence to foster a workable government. *See Tex. Comm'n on Envtl. Quality v. Abbott*, 311 S.W.3d 663, 672 (Tex. App.—Austin 2010, pet. dism'd) (quoting *Bd. of Ins. v. Betts*, 309 S.W.2d 846 (Tex. 1958) (orig. proceeding)). This is so because not every governmental power necessarily fits logically and clearly into any particular branch or department. *Id.* at 671. Thus, coordination and cooperation among the branches is both usual and expected. *Betts*, 308 S.W.2d at 852.

But, interdependence is exceeded and the powers of the other are transgressed when 1) one branch assumes, or is delegated, a power that is more properly attached to another or 2) one branch unduly interferes with another so that the other cannot effectively exercise its constitutionally assigned powers. *Abbott*, 311 S.W.3d at 672 (quoting *Jones v. State*, 803 S.W.2d 712, 715–16 (Tex. Crim. App. 1991) (en banc)). Assessing whether this occurs in a particular situation entails the application of a two-step test. *Id.* The first step focuses on the scope of the assigned power, while the second assesses the impact of the act in question upon that power's exercise. *Id.* We conclude that a court's adjudicating whether a constitutional proposition as written on a ballot violates neither step.

3

First, per our Texas Constitution, "[t]he Legislature . . . may propose amendments revising the Constitution, to be voted upon by the qualified voters for statewide offices and propositions, as defined in the Constitution and statutes of this State," and "[t]he date of the elections shall be specified by the Legislature." TEX. CONST. art. XVII, § 1(a). The following section states that a "brief explanatory statement of the nature of the proposed amendment, together with the date of the election and the wording of the proposition as it is to appear on the ballot, shall be published twice in the newspaper in each newspaper in the State which meets requirements set by the Legislature for the publication of official notices of officers and departments of the state government." *Id.* art. XVII, § 1(b). The "explanatory statement shall be prepared by the Secretary of State and . . . approved by the Attorney General." *Id.* As can be seen, our Constitution vests the legislature with the power to propose constitutional changes, select the election date on which they will be considered, and the manner of their publication to the voters. Matters to be so published in the newspaper are an "explanatory statement of the nature of the amendment," the election date, and "the wording of the proposition as it is to appear on the ballot." And, that the Constitution leaves drafting the "explanatory statement" to the Secretary of State, which draft the Attorney General must approve, is informative. Both are part of the executive branch. *Id*. art. IV, § 1. And so leaving to the executive branch aspects of the constitutional amendment process evinces an intended interdependence, as opposed to an independence, among branches.

Next, we find an omission in article XVII, § 1. Nowhere does it ***expressly*** state who drafts the "wording of the proposition as it is to appear on the ballot." Nevertheless, the court from which this appeal originated has held that our "Constitution has vested in the legislature a discretion as to the form in which constitutional amendments may be

proposed and submitted." *Whiteside v. Brown*, 214 S.W.2d 844, 850 (Tex. Civ. App.—Austin 1948, writ dism'd w.o.j.). It made that statement in the context of submitting the amendment to the general public for approval and assessing the sufficiency of the ballot language. *Id.* at 849 (describing the issues for review as whether "(1) that ballot was in the form of one amendment . . . ; and (2) the ballot used did not contain a sufficient description of the proposed amendment"). Given *Whiteside*, its context, and its binding nature upon us per Texas Rule of Appellate Procedure 41.3, we cannot but say that drafting the proposition to appear on the ballot is a power left by our Constitution to the legislature's discretion. Simply put, it has the discretion to select the words it cares to submit for consideration by the electorate.

Then again, the legislature decided it need not be the sole branch of government under the Constitution to exercise that discretion. This decision was manifested in the Texas Election Code. There, it wrote that a member of the executive branch, i.e., the Texas Secretary of State, could perform the act in its stead. *See* TEX. ELEC. CODE ANN. § 274.001(a) (stating that "[i]f the legislature fails to prescribe the wording of the proposition submitting a proposed constitutional amendment, the secretary of state shall prescribe it"). If nothing else, this too evinces a desire for an interdependence between governmental departments.

Of further note about *Whiteside*, it did not forbid the judiciary from assessing the sufficiency of ballot language despite the legislature having discretion to draft it. Rather, the panel applied a test by which adequacy could be measured. That test emanated from the predecessor to § 274.001 of the Election Code. It provided that "[w]hen a proposed constitutional amendment . . . is to be voted on, the form in which it is submitted, if the Legislature has failed to prescribe the same, shall be prescribed by the Governor . . .

5

describing the same in such terms as to give **a clear idea of the scope and character of the amendment** in question." *Whiteside*, 214 S.W.2d at 851 (quoting TEX. REV. CIV. STAT. ANN. art. 2982 (emphasis added).[2]  Though the *Whiteside* court observed that the highlighted test, "strictly speaking," did not actually control the outcome of the case because the legislature wrote the ballot language, the court nonetheless applied it.  *Id*.  And, utilizing it as a component of the sufficiency equation is another instance of governmental branches (this time, the judiciary) endeavoring to work interdependently when it came to elections concerning the amendment of our Constitution.

*Whiteside* was not the lone instance of the judiciary's involving itself in the analysis of ballot language in referendums to amend the Constitution.  That also occurred in *Hardy v. Hannah*, 849 S.W.2d 355 (Tex. App.—Austin 1992, writ denied).  Indeed, our Supreme Court did so as well in *Railroad Comm'n of Tex. v. Sterling Oil & Refining Co*., 147 Tex. 547, 218 S.W.2d 415 (Tex. 1949).  Those courts having insinuated themselves into the discussion is persuasive for another reason.  Simply put, they, like every court, were obligated to sua sponte determine whether jurisdiction existed to adjudicate the dispute.  *See Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 70–71 (Tex. 2021).  As the *Haynes* court said, "[a]lthough the parties do not raise this issue, we must consider it *sua sponte* when our jurisdiction seems in doubt."  By adjudicating the dispute before them, one can say, the Third Court of Appeals and Texas Supreme Court had no doubt about their jurisdiction to act.

---

[2] Today's corollary is found in the Election Code.  In providing for the Secretary of State to draft the language should the legislature not, the verbiage "must describe the proposed amendment in terms that clearly express its scope and character."  TEX. ELEC. CODE ANN. § 274.001(b).

6

One other circumstance warrants attention. It too concerns an act of the legislature evincing intent to invite the judiciary into this constitutional fray. We find it in § 233.014(g) of the Texas Election Code. Through it, the legislature directed that "[a]ny question relating to the validity or outcome of a constitutional amendment election may be raised in an election contest." TEX. ELEC. CODE ANN. § 233.014(g). "Any question" is quite a borderless term. It hardly denotes some intent to differentiate between the disputes subject to adjudication. One can also reasonably view it as another example of intent to foster the interdependence among the branches alluded to earlier.

The question posed by Nelson has no easy, quick answer. Yet, the indicia discussed above provide guidance. They lead us to conclude that the separation of powers doctrine does not stay the judiciary's hand in this case. When it comes to ballot language, there is interdependence between the judiciary and legislature, as opposed to the strict independence proposed by Nelson.

### *Political Question*

The same is no less true regarding the political question doctrine. The latter is primarily a function of the separation of powers. *Am. K-9 Detection Servs., LLC v. Freeman*, 556 S.W.3d 246, 253 (Tex. 2018) (quoting *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)).

As said above, drafting the ballot language falls within the constitutional powers of the legislature, according to *Whiteside.* Yet, again, the particular power is not expressly mentioned in the Texas Constitution. This is of import for a lack of textually demonstrable constitutional commitment of the issue to a coordinate branch of government is a factor influencing the applicability of the political question doctrine. *Id.* at 252–53.

7

That there exists a judicially manageable standard for testing the adequacy of ballot language also sways against application of the doctrine. *See id.* (noting that a lack of judicially discoverable and manageable standards for resolving the question as another factor). We find that standard most recently iterated in *Dacus v. Parker*, 466 S.W.3d 820 (Tex. 2015). Per the Supreme Court, the language "must 'substantially submit[] the question' with 'definiteness and certainty'"; that is, it "must identify the measure by its chief features, showing its character and purpose." *Id.* at 825.

Nor do we find it impossible to test the ballot's language without first 1) engaging in policy determinations of a kind clearly reserved to nonjudicial discretion or 2) expressing disrespect to a coordinate branch of government. *See Am. K-9 Detection Servs.,* 556 S.W.3d at 252 n.18 (listing these as components of the political question equation). After all, the test applied likens to that selected by the legislature when analyzing the sufficiency of ballot language written by the Secretary of State. *See Dacus,* 466 S.W.3d at 825 (stating that "the ballot must identify the measure by its chief features, showing its character and purpose" and comparing the test to that provided in § 274.001 of the Election Code). So, to some extent, it can be said that testing the adequacy of the language follows a path already prescribed by the legislature.

Similarly missing is the need for unquestioning adherence to a political decision already made or a potential for embarrassment arising from multifarious pronouncements by various departments on the same question. Those also are factors. *Am. K-9 Detection Servs., LLC*, 556 S.W.3d at 252 n.18. We do not see how determining whether language clearly expresses an amendment's "scope and character" or "character and purpose," whether under § 274.001(b) or *Dacus*, respectively, constitutes a political decision to which one must adhere unquestionably. It simply involves the exercise of interpreting

8

words against a designated standard, an exercise in which the judiciary legitimately engages each day.

We further add into the analysis the fact of the judiciary's historic involvement in disputes about ballot language. The legislature's having done nothing to halt it despite *Whiteside*, *Hardy*, and *Sterling Oil* indicates that it did not care to retain the question for itself.

In sum, pertinent indicia do not lean in favor of Nelson's argument. Thus, we reject the argument that the political question doctrine bars the judiciary from testing the sufficiency of ballot language in referendums proposing to alter our Constitution. And, with that, we overrule issue one.

### Facially Valid Claim

By her second issue, Nelson advances a sovereign-immunity claim based on *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*, 647 S.W.3d 681 (Tex. 2022). The latter, according to Nelson, obligates McCarty to proffer a facially valid claim to pierce the sovereign's immunity, and McCarty purportedly failed to do so. We overrule the issue.

*Abbott* dealt with a declaratory action implicating the constitutionality of a statute. In addressing whether the trial court erred in denying Governor Abbott's plea to the jurisdiction, the Supreme Court said: "Although the UDJA generally waives immunity for declaratory-judgment claims challenging the validity of statutes, we have held that 'immunity from suit is not waived if the constitutional claims are facially invalid.'" *Id.* at 698 (quoting *Klumb v. Houston Mun. Emps. Pension Sys.,* 458 S.W.3d 1 (Tex. 2015)). This statement is little more than iteration of its earlier holding in *Andrade v. NAACP of Austin*, 345 S.W.3d 1 (Tex. 2011). There, the court said that "the Secretary [of State]

9

retains immunity from suit unless the voters have pleaded a viable claim." *Id.* at 11. To determine whether McCarty pleaded such a "viable claim," we find guidance from *Dacus*.

In *Dacus,* the voters were asked to approve an amendment to the Houston city charter creating a "pay-as-you-go fund." In assessing whether the ballot sufficiently explained the amendment, the Supreme Court observed that "[t]he language . . . merely stated the amendment was 'Relating to the Creation of a Dedicated Funding Source to Enhance, Improve and Renew Drainage Systems and Streets.'" *Dacus*, 466 S.W.3d at 822. Missing, though, was mention that "the drainage charges [were] to be imposed on benefitting real property owners across the city." *Id.* at 826. "Such charges imposed directly on most residents of Houston [were] a chief feature of the amendment, part of the amendment's character and purpose," according to the court. *Id.* "Merely stating that a fund is being established provides little definiteness or certainty about something important to the people—will they directly pay for it?" *Id.* "[W]hen the citizens must fund the measure out of their own pockets, this is a chief feature that should be on the ballot, and its omission was misleading." *Id.* And, due to the omission, the court found the language deficient. *See id.* at 829.

We read the foregoing as placing importance on the effect a constitutional amendment would have on the voter's pocketbook. Whether it be "Taxation without representation" or "Should five percent appear too small, be thankful I don't take it all"[3] or "There goes the shirt off my back"[4] or "I'm payin' taxes but what am I buyin'?"[5]—each

---

[3] THE BEATLES, *Taxman*, *on* REVOLVER (Capitol Records 1966).

[4] JOHNNY CASH, *After Taxes*, *on* I WOULD LIKE TO SEE YOU AGAIN (Columbia 1978).

[5] FRED WESLEY AND THE J.B.'S, *I'm Paying Taxes, What Am I Buying?*, *on* DAMN RIGHT I AM SOMEBODY (People Records 1974).

10

exemplifies the perennial interest of the citizenry in protecting the fruits of their labor from expropriation by the government. No doubt, a component of a constitutional amendment enabling the government to further appropriate money from one's pocket would be a chief feature of the proposal. It matters not whether the appropriation is certain or a likelihood. The risk of additional loss made possible by adoption of the amendment remains, and it is a risk of historical and prime interest to the voting public.

Here, voters were asked to approve a measure containing the following ballot language: "[t]he constitutional amendment authorizing a county to finance the development or redevelopment of transportation or infrastructure in unproductive, underdeveloped, or blighted areas in the county." As can be seen, nothing was said about how the "development or redevelopment of transportation or infrastructure" would be financed or who would fund it. Hidden from view was the ultimate responsibility for payment and its positioning over the voter's head like the sword of Damocles. The constitutional amendment itself illustrated that funding would be through "bonds or notes" issued by the county; yet, the county would be permitted to pay them through "increases in ad valorem tax revenues imposed on property in the area." Authorizing counties to foist payment of the improvements on property owners likens to the chief feature of the constitutional amendment found missing from the ballot in *Dacus*. Its absence from the ballot here precludes us from holding that McCarty's claim has no facial validity.

### *Associational Standing*

Through her third and final issue, Nelson asks that we dismiss True Texas Project, Texans Uniting for Reform and Freedom, and Grassroots America – We the People (the organizations) as parties from this cause. We deny the request.

11

An election contest is the sole means for adjudicating questions about the validity or outcome of a constitutional amendment election. TEX. ELEC. CODE ANN. § 233.014(g). The statute setting forth the mode of that contest also states that "[o]ne or more **qualified voters** of the territory covered by an election on a measure may contest the election." *Id.* § 233.002 (emphasis added). A "qualified voter" is "a person" who 1) is at least 18 years old, 2) is a United States citizen, 3) is not someone adjudicated to be totally mentally incapacitated or partially mentally incapacitated without the right to vote, 4) has not been finally convicted of a felony (save for several inapplicable exceptions), 5) is a resident of Texas, and 6) is a registered voter. *Id.* § 11.002(a). McCarty alleged in "Contestant's [sic] Original Election Contest" that "Contestants True Texas Project, Texans Uniting for Reform and Freedom, and Grassroots America — We the People are Texas non-profit organizations composed of qualified Texas voters." Describing them as non-profit organizations comprised of qualified voters as opposed to qualified voters themselves, McCarty may have displaced the organizations from the category of those allowed to attack the results of a constitutional amendment election. *See Nw. Indep. Sch. Dist. v. Carroll Indep. Sch. Dist.*, 441 S.W.3d 684, 691 (Tex. App.—Fort Worth 2014, pet. denied) (op. on reh'g) (en banc) (holding that a school district is not a "qualified voter" under § 233.002). Yet, Nelson did not raise this particular topic below. This causes us to hesitate.

"When a defendant raises a jurisdictional argument for the first time on appeal, remand may be appropriate to afford the plaintiff a 'fair opportunity to address' the jurisdictional argument." *Harris Cnty v. Annab*, 547 S.W.3d 609, 616 (Tex. 2018). The rule also applies to disputes involving immunity and its waiver.

12

One generally has a right to amend pleadings when the document fails to allege enough jurisdictional facts to demonstrate the trial court's jurisdiction. *River City Partners, Ltd. v. City of Austin*, No. 03-19-00253-CV, 2020 Tex. App. LEXIS 4301, at *21–22 (Tex. App.—Austin June 4, 2020, no pet.) (mem. op.). That right may be lost, though, if the party received a reasonable opportunity to amend after a governmental entity filed its plea to the jurisdiction and the amended pleading continues to omit facts illustrating a waiver of immunity. *Id.* At this juncture, we cannot say McCarty received such a reasonable opportunity. Again, it was not afforded below given Nelson's failure to there complain about the organizations' unique inability to prosecute the suit. Consequently, we deem it appropriate to afford McCarty reasonable opportunity to develop the character of Nelson's argument and amend pleadings, if possible, to aver facts establishing jurisdiction. We see no harm in affording such opportunity given that the cause nevertheless remains subject to prosecution by the non-organizational plaintiffs.

We affirm the trial court's order denying the plea to the jurisdiction.


Brian Quinn
Chief Justice